# Illinois Official Reports

## Appellate Court

---

### *People v. Duffie*, 2021 IL App (1st) 171620

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARIUS DUFFIE, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-1620 |
| Filed | September 24, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-16617; the Hon. Thomas V. Gainer Jr., Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Richard Connor Morley, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Michael Vojta, and Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.<br>Justice Connors concurred in the judgment and opinion.<br>Justice Harris dissented, with opinion. |

**OPINION**

¶ 1 Following a bench trial, defendant Darius Duffie was convicted of two counts of possession of a controlled substance and sentenced to concurrent prison terms of four years. On appeal, he contends that the police conducted an unreasonable search when they searched his pants as they executed a search warrant that did not name him. For the following reasons, we affirm in part and vacate in part.

¶ 2                                  I. BACKGROUND
¶ 3                               A. Pretrial Proceedings
¶ 4 On August 15, 2014, defendant was arrested and charged with two counts of possession of less than 15 grams of cocaine and less than 15 grams of benzylpiperazine. He was also charged with armed habitual criminal and unlawful use of a weapon by a felon (UUWF).

¶ 5 The circumstances surrounding defendant's arrest and subsequent convictions stem from events that occurred as Chicago police executed a search warrant that authorized them to search Travis Roby and "The Entire Second Floor Apartment" at 6838 South Laflin Avenue in Chicago (the Laflin apartment) for "MDMA (Ecstasy)," residency documents, drug paraphernalia, money, and records of illegal drug transactions. The August 15, 2014, warrant complaint by Officer Timothy Moran alleged that sales of Ecstasy by Roby occurred at the Laflin apartment to an unnamed informant and made no allegations against defendant.

¶ 6 Prior to trial, defendant filed a motion to suppress evidence on July 2, 2015, contending that he was arrested and searched on August 15, 2014, while visiting the Laflin apartment, without exigent circumstances or defendant's consent to search his person and belongings. He noted that he was not named or described in the warrant. Accordingly, he sought to suppress "any items recovered from the illegal arrest and search of [his] clothing, and statements elicited from him as a direct result of this search."

¶ 7 At the hearing on defendant's motion on October 6, 2015, Chicago police officer Stephen Insley, 1 of 10 officers who executed the warrant, testified that he was told that Roby was the subject of the warrant and was given Roby's description. Upon entering the apartment, other officers detained the five occupants, and the apartment was photographed and searched. Insley observed defendant in the rear bedroom, lying in bed and wearing only shorts. No weapons or contraband were visible. Defendant was not committing any apparent crime, made no threats, and did not attempt to flee. Insley searched defendant's jeans without his permission; the search yielded an identification card and a clear plastic bag containing 24 smaller bags of white rock-like substance suspected to be cocaine. Defendant was then arrested. Insley was not present when defendant was questioned, nor did he search the apartment based on information from defendant. He was aware that other officers found pills suspected to be Ecstasy in the kitchen refrigerator and learned that defendant directed Moran to the refrigerator. No weapon was found in the bedroom where defendant was found.

¶ 8 On cross examination, Insley testified that defendant was in bed with another person when he was found. When he saw defendant, Insley had Roby's description but not his photograph. He searched the pants near defendant before giving them to him, as defendant was wearing only shorts. Insley had not asked defendant for his name at that point. Both defendant and Roby were 25 years old. The identification in the pants was defendant's and bore the address of the

Laflin apartment. The bedroom where defendant was found also contained mail addressed to him at that address. Insley learned from Moran that defendant made inculpatory statements after being Mirandized and that Ecstasy pills were found in the refrigerator. Insley also stated that he searched the pants because Ecstasy pills could fit in the pants pocket. A gun was also found in a sofa in the front room of the apartment. Other than defendant, two women, one man, and a child occupied the apartment when the warrant was executed.

¶ 9 On redirect examination, Insley testified that he did not ask defendant for his name or identification upon finding him in bed with a woman, and he did not search the pants in the room for purposes of identification. Defendant was going to be taken to another room in the apartment during the search. On the day of the search, defendant's hair was braided, but the description of Roby reflected that he had short hair.

¶ 10 During argument, the court noted that there was a height difference of five inches between Roby and defendant. Following arguments, the court denied the motion to suppress, finding that defendant was not the subject of the search warrant or any other warrant but was in bed in the rear bedroom of the subject apartment when the warrant was executed. In securing defendant, Insley "gave the defendant his pants and searched the pants before and recovered a quantity of narcotics." Other drugs and a gun were found elsewhere in the apartment. The court found that the issue was whether the search of defendant's pants was proper under the circumstances. It held that finding defendant in bed wearing only shorts with pants nearby established a sufficient connection to the premises to justify searching the pants before giving them to defendant for officer protection or to prevent disposal or concealment of anything being searched for pursuant to the warrant. In other words, defendant being in bed with his girlfriend was more than his mere presence in the apartment. Indeed, the evidence showed that he resided there. The holding was "limited to the search of his jeans." The other contraband was recovered pursuant to the warrant and "while not particular to this defendant" could be used in his trial "for what that's worth."

¶ 11 Defendant subsequently filed a motion to suppress statements on February 8, 2016, contending that he was placed in custody at the Laflin apartment and interrogated by police without being Mirandized, he did not knowingly waive his privilege against self-incrimination, and the fact that he made a statement was insufficient evidence of waiver.

¶ 12 At the hearing on that motion on May 9, 2016, defendant testified in relevant part that he was asleep in bed with his girlfriend in the back bedroom of the Laflin apartment when the warrant was executed. He heard the police and the kicking of the bedroom door open before three to four officers entered. Defendant was told to show his hands and he told the officers that he was naked under the sheet. Police located his gym shorts and boxers and searched them before handing them to him. Defendant was handcuffed while his girlfriend was also given shorts and taken to the bathroom and searched. He stated that he was never Mirandized and was subsequently led to the dining room area before he was taken to the kitchen. Defendant then stated that the police searched the refrigerator and recovered a bag from the freezer. He stated that he never said anything to the officers that directed them to the freezer. After the apartment search, defendant was taken to the police station and placed in an interview room. Defendant stated that he was still sleepy and was drifting in and out of sleep while he was there. He did not recall being told that he had the right to remain silent and stated that he was not advised that he had the right to an attorney. Nor did he recall making statements to the

police. Defendant testified that he subsequently learned that his alleged statements were going to be used against him in the case.

¶ 13   On cross-examination, defendant clarified that he did not recall because he was drifting in and out of sleep at the station due to being hung over, and although he was jolted awake at the house, he did not recall being Mirandized. He mostly recalled his daughter crying. Defendant remembered that at the station, Moran was present and that he was taken to an interview room. He recalled being asked if he knew someone named Travis Roby, which he did not.

¶ 14   On recross examination, defendant stated that he had finished drinking just before entering the apartment at approximately 6:30 a.m. and fell asleep at approximately 8:30 a.m. However, his intoxication did not prevent him from being able to comprehend the officers' directives.

¶ 15   Moran testified that he was part of a team executing the search warrant for the Laflin apartment, where contraband was found, and he identified defendant in court as the person that was arrested that day. Defendant was placed in custody in the bedroom and Moran indicated that he Mirandized defendant from the preprinted form in the back of his "FOP handbook," which he read in open court. He stated that defendant acknowledged the *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), but he could not recall if defendant made a statement or a nonverbal head nod. When asked if there was anything in the apartment that the police should know about, defendant told them he had a little Ecstasy and directed them to the refrigerator where drugs were recovered from the freezer. Defendant was subsequently taken to the police station where Moran interviewed him in the presence of other officers. Moran testified that he again Mirandized defendant, who stated that he understood. Defendant did not appear to be falling asleep while Moran spoke to him.

¶ 16   On cross-examination, Moran stated that Insley found a pair of jeans in the bedroom and was handing them to defendant when he discovered some crack cocaine in the pocket of the jeans. Moran stated that he could not remember how defendant acknowledged the *Miranda* warnings while they were in the bedroom, and he did not include the statement that defendant had a little Ecstasy in his police report. However, Moran again indicated that based on defendant's statement they went to the freezer and recovered the drugs in defendant's presence. Moran acknowledged that his report did not state that Insley was present when he Mirandized defendant in the bedroom. He also admitted that when he Mirandized defendant at the station, he read through without stopping and was unaware whether defendant's eyes were open. Moran then asked whether defendant wished to answer questions about the recovered weapon and drugs and defendant replied "yes."

¶ 17   At the end of the hearing, the trial court found that defendant was not as "drunken and passed out" that he claimed to be and that he very clearly stated that he comprehended everything that happened, including the identity of the officers and a specific conversation about Travis Roby. The court concluded that he did not believe defendant's statements that he comprehended everything at the apartment but reverted to a drunken state at the station and could not recall anything. Defendant's motion to suppress was then denied.

¶ 18                                B. Trial

¶ 19   At trial, Moran testified that he and other officers executed the search warrant for the Laflin apartment. After entering, Moran went to the kitchen and the bedroom adjoining the kitchen, where he saw defendant and a woman in bed. Moran was present when defendant asked for pants and Insley picked up a pair of pants from the floor. Upon search of the pants, Insley

found defendant's identification and a plastic bag containing 24 smaller bags of a substance suspected to be cocaine in the pocket. Another officer found a government document with defendant's name on it in the bedroom. Defendant was arrested. After Mirandizing him, Moran asked him if there was any other contraband in the apartment. Defendant replied that there was Ecstasy in the freezer and led Moran to the kitchen refrigerator where an officer found a bag of pills in the freezer. Officer Daniel Passarelli directed Moran to the living room, where Moran saw a loaded pistol under a sofa cushion. Defendant was taken to the police station, where Moran interviewed him after Mirandizing him. When asked about the contraband in the apartment, he acknowledged possessing the Ecstasy, cocaine, and gun but maintained he was merely holding the gun for Roby.

¶ 20    On cross-examination, Moran acknowledged that defendant was not the subject of the search warrant. Other people were in the apartment when Moran entered, including in the front or living room, but no weapons were visible. In executing a warrant in a home, the occupants are typically brought to the living room so they can sit on the sofa. Passarelli found the gun in the sofa while "clearing" it. The bedroom where defendant was found was the furthest from the living room. Defendant never told Moran that he had a gun in the living room sofa. The gun was submitted for fingerprint testing but to Moran's knowledge no fingerprints linked it to defendant.

¶ 21    Insley testified consistently with his hearing testimony, adding that Moran told defendant of the search warrant, the jeans were on the floor near the bed, and Insley searched them for weapons as a matter of "officer safety." On cross examination, Insley testified that no weapons were visible in the apartment when he entered it and defendant did not direct him to the gun.

¶ 22    Passarelli testified that, in executing the warrant, he searched the living room sofa "to make safe" when he found the loaded gun under the sofa cushion. Only police officers were in the living room when he found the gun, and it was not visible upon entering the room.

¶ 23    The parties stipulated that the recovered pills weighed less than 15 grams and tested positive for benzylpiperazine and that the contents of 13 of the 24 bags recovered from the jeans weighed 1.1 grams and tested positive for cocaine. The parties also stipulated to defendant's prior convictions for the weapons charges.

¶ 24    Following closing arguments, the trial court found defendant guilty of two counts of possession of a controlled substance and not guilty of the weapons charges. It found that, in executing the warrant at the Laflin apartment, Moran and Insley found defendant in the rear bedroom in bed with a woman, defendant had no pants and asked for pants, and Insley searched the pants, finding cocaine. Defendant then directed Moran to the refrigerator where benzylpiperazine was found. There was evidence that defendant admitted, while at the police station, that he possessed the gun on Roby's behalf; however, he made no such admission at the scene, he was not in possession of the gun when police executed the warrant, and there were other people in the apartment.

¶ 25                                    C. Posttrial Proceedings
¶ 26    In his posttrial motion, defendant claimed that the State failed to prove him guilty beyond a reasonable doubt as there was no evidence he exclusively controlled or actually possessed the recovered substances. He argued in part that the State's case centered upon Moran's testimony "that the suspect narcotics were recovered during the execution of a search warrant" in which police "were not at the residence 'looking' for" defendant. However, the motion did

not challenge or even mention denial of the motion to suppress. In denying the posttrial motion, the trial court reiterated that the evidence of defendant's possession of the contraband was sufficient.

¶ 27 Following a sentencing hearing, the court sentenced defendant to concurrent prison terms of four years, and this appeal timely followed.

¶ 28                                              II. ANALYSIS

¶ 29 On appeal, defendant contends that police conducted an unreasonable search in violation of his rights when they searched his pants as they executed a search warrant that did not name him. He argues that the police did not have probable cause to search him or his pants as the warrant only allowed police to search Roby and the second floor of the Laflin apartment. Defendant asserts that while officers did not know his identity, they knew that he was not Roby as he did not match the description in the warrant; moreover, there was nothing in the record that suggests that he acted suspiciously, furtively, or threateningly or that there was any specific reason to believe that he was concealing contraband or a weapon. He contends that the search was illegal and the trial court's denial of his motion to suppress was manifestly erroneous. Defendant further maintains that because officers lacked individual probable cause to search him, we should suppress the cocaine, his identity, and the statements he made inside the residence as fruits of the illegal search and remand for a new trial.

¶ 30 We note that while defendant's opening brief makes passing statements regarding suppression of his identity and the statements he made in the residence connected to the Ecstasy found in the freezer, defendant did not fully brief those issues. We further note that defendant concedes in his reply brief that the Ecstasy found in the freezer and the mail documents found in the residence would be admissible at a new trial pursuant to the inevitable discovery doctrine because the officers had independent authority to search the residence and those items would have ultimately been discovered. As a reviewing court, we are entitled to have the issues clearly defined, pertinent authority cited, and a cohesive legal argument presented. *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88. The appellate court is not a depository in which the appellant may dump the burden of argument and research. *Id.* Accordingly, we will not consider the aforementioned issues due to defendant's failure to fully brief them.

¶ 31                                             A. Forfeiture

¶ 32 As a threshold matter, defendant's posttrial motion did not challenge the denial of his motion to suppress. Generally, a claim is forfeited when not raised both contemporaneously and in a posttrial motion. *People v. Reese*, 2017 IL 120011, ¶ 60. Our supreme court has recognized three exceptions to this requirement. *People v. McDonald*, 2016 IL 118882, ¶ 45. Reviewing courts will review (1) constitutional issues properly preserved at trial that may be raised later in a postconviction petition, (2) challenges to the sufficiency of the evidence, and (3) plain errors. *Id.* In *People v. Enoch*, 122 Ill. 2d 176, 190 (1988), our supreme court held that when a defendant only fails to comply with the statutory requirement to file a posttrial motion, we can review issues under one of the three exceptions in order to promote judicial economy and finality of judgments.

¶ 33 Here, we note that defendant has not requested that this court review his claims under the plain error doctrine, under which he bears the burden of persuasion on both the threshold question of plain error and the question of whether he is entitled to relief as a result of the error.

*McDonald*, 2016 IL 118882, ¶ 48. Nor has defendant requested review of claims under any other method whereby we can consider a forfeited claim.

¶ 34     However, our supreme court has previously determined that the constitutional-issue exception applies when a defendant's motion to suppress asserts a violation of his constitutional right to be free from unreasonable searches and seizures because defendant raised the issue at trial and can raise it later in a postconviction petition. *People v. Cregan*, 2014 IL 113600, ¶ 20. It found that the interests in judicial economy favored addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition and concluded that the constitutional-issue exception could be applied. *Id.* ¶¶ 18, 20.

¶ 35     In the case at bar, defendant has asserted a violation of his constitutional right to be free from unreasonable searches. As such, we will apply the constitutional-issue exception to review his claim on direct appeal and now turn to the merits of this appeal.

¶ 36                              B. Standard of Review

¶ 37     In reviewing a ruling on a motion to suppress, a reviewing court gives great deference to the trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* ¶ 22. The trial court's legal ruling on whether evidence should be suppressed is reviewed *de novo*. *Id.*

¶ 38     The defendant bears the burden of proof on a motion to suppress evidence. *Id.* ¶ 23; 725 ILCS 5/114-12(b) (West 2014). If the defendant makes the *prima facie* showing that the evidence was obtained in an illegal search or seizure, the burden shifts to the State to provide evidence to counter the defendant's *prima facie* case. *Cregan*, 2014 IL 113600, ¶ 23. The ultimate burden of proof remains with defendant. *Id.* The reviewing court may consider evidence adduced at trial as well as at the suppression hearing. *People v. Smith*, 2015 IL App (1st) 131307, ¶ 20.

¶ 39     Here, defendant made a *prima facie* case that the officer obtained the drugs from his pants pocket by arguing that police searched his pants without a warrant, during the execution of a warrant for the premises where he was located. The burden then shifted to the State to present evidence that the search was valid.

¶ 40                           C. Search of Defendant's Pants

¶ 41     The fourth amendment of the United States Constitution states, in pertinent part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. Likewise, article I, section 6, of the Illinois Constitution of 1970 states, "[n]o warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6; see also 725 ILCS 5/108-7 (West 2014) (requiring the place or person to be searched and the items to be seized to be "particularly described in the warrant"). The essential purpose of the fourth amendment is to impose a standard of reasonableness on the exercise of discretion by police to safeguard the privacy and security of people against arbitrary invasions. *Smith*, 2015 IL App (1st) 131307, ¶ 21; see also *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979); *People v. Colyar*, 2013 IL 111835, ¶ 31; *People v. McDonough*, 239 Ill. 2d 260, 266 (2010).

Reasonableness is measured in objective terms by examining the totality of the circumstances. *People v. Moss*, 217 Ill. 2d 511, 518 (2005) (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

¶ 42    A valid search warrant must particularly describe the place or person to be searched and the things to be seized. 725 ILCS 5/108-7 (West 2014). "The purpose of this requirement is to prevent the use of general warrants that would give police broad discretion to search and seize." *People v. Burmeister*, 313 Ill. App. 3d 152, 158 (2000).

¶ 43    In this case, police had a warrant for Travis Roby, and the Laflin apartment for "MDMA (Ecstasy)," residency documents, drug paraphernalia, money, and records of illegal drug transactions. As previously noted, defendant was not named in the warrant, and he argued that it was clear he was not the subject of the warrant, even though police did not know his identity before his pants were searched. Additionally, defendant contends that he was not behaving in such a way that he posed a threat to the officers' safety, thus a search of his pants before they were handed to him was unreasonable.

¶ 44    Section 108-9 of the Code of Criminal Procedure of 1963 (Code), "Detention and Search of Persons on Premises," provides:

> "In the execution of the warrant the person executing the same may reasonably detain to search any person in the place at the time:
>
> > (a) To protect himself from attack, or
> >
> > (b) To prevent the disposal or concealment of any instruments, articles or things particularly described in the warrant." 725 ILCS 5/108-9 (West 2014).

¶ 45    Our supreme court has recognized that the section cannot authorize searches of persons merely because they are on premises for which a warrant was issued without violating constitutionally protected rights. *People v. Gutierrez*, 109 Ill. 2d 59, 62 (1985); *People v. Gross*, 124 Ill. App. 3d 1036, 1039 (1984). Consequently, persons searched under the authority of this section must have a sufficient "connection" with the premises or with persons described in the search warrant. *Gutierrez*, 109 Ill. 2d at 62. Factors considered on the question of "connection" have included the status of the person, where he resided, his conduct, and the purpose of his presence. *Id.* However, the holding in *Ybarra v. Illinois*, 444 U.S. 85, 90-96 (1979), requires that independent probable cause must be shown to conduct a search of a person on the premises but whose search is not authorized by warrant. Therefore, the issue before us is whether the police lacked probable cause to search defendant in violation of the search and seizure guarantees of the fourth and fourteenth amendments of the United States Constitution (U.S. Const., amends. IV, XIV).

¶ 46    An officer has probable cause to make an arrest when the totality of circumstances would permit a reasonably prudent person to believe that the suspect is committing a crime. *People v. Spann*, 237 Ill. App. 3d 705, 710-11 (1992). A seizure, for fourth amendment purposes, is synonymous with an arrest. *Id.* at 711.

¶ 47    Here, the evidence established that police had a valid search warrant for Travis Roby and the Laflin apartment for drugs and drug-related evidence. There were several people in the apartment when the warrant was executed, including defendant, who was sleeping in a back bedroom when the police arrived. It is undisputed that defendant was not named in the warrant and that he did not bear a similar appearance to the person described in the warrant. The evidence also established that defendant was not clothed when the police arrived and either requested or was given a pair of pants in the room. However, before handing the pants to

defendant, Insley searched the pockets and recovered defendant's identification and suspect crack cocaine. It is further undisputed that defendant was not behaving in any suspicious manner, and there was no testimony that the police were in danger or were threatened by defendant. Indeed, the recovered drugs weighed less than 15 grams, so it could not reasonably be argued that police believed there was a weapon in the pants. Additionally, Insley testified at the hearing on the suppression motion that "Ecstasy fit in a pants pocket."

¶ 48    We conclude that section 108-9 of the Code does not establish independent probable cause for defendant's pants to be searched during execution of the search warrant. Instead, we find this case is comparable to *People v. Simmons*, 210 Ill. App. 3d 692 (1991), and *Gross*.

¶ 49    In *Simmons*, we held that the defendant's mere presence on the premises in a room that an informant had told police was used to ingest cocaine did not establish that there was an independent probable cause to search defendant. *Id.* at 700. We concluded that, where the defendant cooperated with the police and did not act in suspicious manner or make any furtive gestures, "the belief that defendant possessed cocaine was a mere hunch or suspicion, which [was] insufficient to establish probable cause to search him. *Id.* at 701.

¶ 50    Similarly, in *Gross*, we found that the police did not have probable cause to search the defendant, a social guest who was present during the execution of a search warrant, even though the premises were the site of suspected drug trafficking and the search revealed an " 'array' " of drugs throughout the house. *Gross*, 124 Ill. App. 3d at 1039. We concluded that, since defendant did not act suspiciously nor did the officers executing the warrant have any specific reason to believe that the defendant was concealing contraband or a weapon, the defendant was searched simply because she was present while the warrant was being executed, which is not permitted. *Id.*

¶ 51    The facts do not suggest that defendant behaved suspiciously or that there was independent probable cause that he may have been engaged in criminal activity. Defendant never made any furtive motions and did not attempt to flee. Nor was defendant armed or acting in a threatening manner. As noted by defendant in his brief, he was asleep and roused by the police kicking in the door, which is the opposite of threatening. We believe that Insley did not have independent probable cause to search defendant's pants, and accordingly, the trial court erred in denying defendant's motion to suppress the evidence that was taken from defendant's pants pocket.

¶ 52    The dissent relies on *In re C.K.*, 250 Ill. App. 3d 834 (1993), to support its position that independent probable cause is not required to substantiate the search of defendant's pants. However, we find that case factually distinguishable. In that case, the respondent was convicted of constructive possession of drugs lying in the officer's plain sight in a room where he was sleeping while the police were executing a warrant. *Id.* at 835. Additionally, the respondent was searched after he was escorted from the room where the drugs were observed and recovered, and additional drugs were recovered from respondent's person during that search. *Id.* The court noted that "[t]he officers executing the warrant could reasonably have believed either that respondent resided at the premises or that independent probable cause existed to search respondent." *Id.* at 837. "In addition, the police discovered eight bags containing a controlled substance that were in plain view on a table a few feet from where respondent was sleeping. This fact gave the officers probable cause to believe that respondent constructively possessed the cocaine on the table." *Id.*

¶ 53    However, such facts are not present in the case at bar. Here, while executing a search warrant, the officers encountered defendant and a companion sleeping in a bedroom. There

was no testimony or evidence as to any suspected contraband in plain sight that would support independent probable cause to search defendant's pants before handing them to him.

¶ 54 We therefore reverse the trial court's ruling on the motion to suppress the cocaine recovered from defendant's pants pocket, vacate defendant's conviction and sentence for possession of cocaine, and remand for further proceedings. *People v. Walker*, 2013 IL App (4th) 120118, ¶ 53 (because the trial court found the search valid and thus did not have the opportunity to consider the ramifications of the invalid search, we remand this case for further proceedings).

¶ 55                                     III. CONCLUSION

¶ 56 For the foregoing reasons, the trial court's ruling on the motion to suppress is reversed as to the cocaine recovered from defendant's pants pocket, his conviction and sentence for possession of cocaine is vacated, his conviction and sentence for possession of benzylpiperazine is affirmed, and the cause is remanded for further proceedings.

¶ 57 Affirmed in part and vacated in part; cause remanded.

¶ 58 JUSTICE HARRIS, dissenting:

¶ 59 I respectfully disagree with my colleagues that the trial court erred in denying defendant's motion to suppress. Defendant contends, and my colleagues agree, that the decision of the United States Supreme Court in *Ybarra* categorically requires independent probable cause, which did not exist here. However, I would follow our supreme court's decision in *Gutierrez*, which I find to not be contrary to *Ybarra*, and this court's decision in *In re C.K.*

¶ 60 In *Ybarra*, 444 U.S. at 87-89, police obtained a warrant to search a tavern and its bartender for evidence of controlled substance offenses. Upon entering the tavern, an officer performed a frisk for weapons of all the customers including Ybarra, whose frisk found a cigarette pack. The officer later returned to Ybarra, retrieved the cigarette pack, and found it to contain tinfoil packets in turn containing heroin. The Supreme Court held that the search warrant did not permit searches of all the tavern customers (*id.* at 91-92) and police could not frisk Ybarra for weapons absent individualized suspicion (*id.* at 93-94).

> "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. [Citation.] Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.* at 91.

¶ 61 In *Gutierrez*, our supreme court stated that "the holding in *Ybarra v. Illinois* [citation] requires that independent probable cause must be shown in order to conduct a search of a person on the premises but whose search is not authorized by warrant." *Gutierrez*, 109 Ill. 2d at 62. Therefore, section 108-9 "cannot authorize searches of persons merely because they are on premises for which a warrant has been issued, without violating constitutionally protected rights. Consequently, persons searched under the authority of this section must have a sufficient 'connection' with the premises or with persons described in the search warrant." *Id.*

Factors considered in determining such a connection include "the status of the person, where he resided, his conduct, and the purpose of his presence." *Id.*

¶ 62    In *C.K.*, this court considered a case where, similarly to this case, the respondent "was not the person named in the search warrant" and argued that "since he was merely a social guest at the premises he could not be searched incident to the execution of the warrant absent independent probable cause," while the State argued "that the officers executing the warrant reasonably believed respondent had some connection with the premises where he was found sleeping in an interior bedroom." *C.K.*, 250 Ill. App. 3d at 835-36. Citing *Ybarra* and *Gutierrez*, this court recited that section 108-9 "does not authorize the search of any person who happens to be on the premises at the time a search warrant is executed," but "[e]ither the person must have some connection with the premises or independent probable cause must exist to search that person." *Id.* at 836. As police found the respondent asleep in a bedroom, "it was reasonable for the officers to conclude that respondent had some connection with the premises beyond that of a social guest." *Id.* at 837.

¶ 63    I consider it key that the *Ybarra* Court went from a routine recitation that mere presence or proximity does not constitute probable cause or subject a person to a warrant not expressly encompassing them to a purportedly categorical statement that "a search or seizure of a person must be supported by probable cause particularized with respect to that person" (*Ybarra*, 444 U.S. at 91) in a case regarding the search of a tavern customer where the warrant encompassed the tavern and its bartender. Under such circumstances, the categorial reading of *Ybarra* favored by defendant and my colleagues is *dicta*. In contrast, the *Gutierrez* court not only stated that "persons searched under the authority of [section 108-9] must have a sufficient 'connection' with the premises or with persons described in the search warrant," it recited factors for determining whether such a connection existed. *Gutierrez*, 109 Ill. 2d at 62. This was also *dicta*, but *dicta* our supreme court clearly intended to be applied as written by this court and the circuit courts. Ultimately, I find *Gutierrez* to not be contrary to *Ybarra* insofar as I believe a person who resides at premises that are the subject of a search warrant, like defendant, is encompassed by the warrant itself in a way that the tavern customer in *Ybarra* or the social guest in *Gross* was not. I therefore see no reason not to apply *Gutierrez* as this court recited in *C.K.*: sufficient connection to the premises or person subject to the warrant *or* independent probable cause is required.

¶ 64    Here, the evidence showed that, in executing a search warrant at the Laflin apartment encompassing that residence, though defendant was not named as a subject of the warrant, he was found in bed at least partially unclothed and with someone else also in bed. At least one document found in the room where he was found showed that he resided there. While the majority is correct that this record does not show that such documents were found before defendant's pants were searched, and thus did not create independent *probable cause* for searching his pants, they established his *residence* in the apartment separately from the identification found in his pants. The court reasonably concluded under such circumstances that defendant was not merely present as the Supreme Court condemned in *Ybarra* but had a very strong connection to the premises covered by the warrant.

¶ 65    For the foregoing reasons, I would affirm the judgment of the circuit court.

¶ 66    Lastly, I respectfully disagree with my colleagues that, assuming *arguendo* the search of defendant's pants was improper, the remedy would include vacating his conviction for possession of cocaine. I believe that the inevitable discovery rule would lead to suppression

only of his postarrest admission at the scene that he knew where the Ecstasy was, so that a remand with that statement alone excluded would be the proper remedy for the error perceived by my colleagues. The inevitable discovery rule provides that evidence that would otherwise be inadmissible may be admitted if the State can show that such evidence would inevitably have been discovered without reference to the police error or misconduct. *People v. Sutherland*, 223 Ill. 2d 187, 228 (2006).

¶ 67 Defendant argues that his identity should be suppressed as his identification was found in the search of his pants. However, he concedes in his reply brief that at least one document in the bedroom where he was found, linking him to the apartment, and the Ecstasy in the refrigerator were properly seized under the warrant. The concession is supported by the record: while the identification was found in defendant's pants, personal to him, the documents were found in the room and unquestionably within the scope of the warrant. While there was no testimony to the effect because the focus in the hearings and trial was on defendant rather than the other occupants of the apartment, the police report in the record shows that name checks were performed on the other occupants before their release from being detained. Therefore, if the purported police misconduct had not happened—that is, if police did not search defendant's pants when they did—defendant would have been detained like the other occupants and his identity would nonetheless have been discovered. Combined with discovery of the Ecstasy in the refrigerator and defendant's residence in the apartment shown by the document or documents in the bedroom, defendant would have been arrested on a constructive possession basis for the Ecstasy, searched incident to that arrest, and taken to the police station where he would have been questioned as he was in reality. Only his admission at the scene regarding the Ecstasy, made when he was arrested for the cocaine in his pants, would be suppressed as resulting from the ostensibly improper search.